No. 2-22-0453
Opinion filed September 8, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRYAN WAGNER, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-MR-177 |
| | ) | |
| THE BOARD OF EDUCATION OF NORTH | ) | |
| SHORE SCHOOL DISTRICT 112 and | ) | |
| THE ILLINOIS STATE BOARD OF | ) | |
| OF EDUCATION, | ) | Honorable |
| | ) | Jorge L. Ortiz, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1     In this administrative review action, the plaintiff, Bryan Wagner, appeals from an order of

the circuit court of Lake County that affirmed the decision of the defendant the Board of Education

(Board) of North Shore School District 112 (District) to terminate Wagner from his employment

as a tenured teacher for the District. We affirm.

¶ 2                                I. BACKGROUND

¶ 3     Wagner was a tenured teacher contractually employed by the District from August 1990

until September 2020. During the 2019-20 school year, he was teaching sixth and seventh grade

social studies at Edgewood Middle School (Edgewood). Wagner's wife, Kim, was also a teacher

for the District, since 1999. During the 2019-20 school year, she taught fourth grade at the Indian Trail School. Wagner and Kim have been married for 29 years and have two children.

¶ 4     On June 22, 2020, Wagner was involved in a domestic dispute at his home in Lake Forest and was arrested. He was charged with domestic battery. A report of the arrest was published in various local newspapers. On June 23, 2020, a protective order was issued requiring Wagner to stay away from Kim and their two children. The petition for protective order contained a statement from Kim that Wagner had been verbally and physically abusive and had shoved her to the ground on June 22, 2020. In November 2020, the State dropped the criminal charges against Wagner.

¶ 5     In July 2020, the District became aware of Wagner's June 2020 arrest when Monica Schroeder, the District's deputy superintendent, read an article in a local newspaper that reported the arrest. After reading the news article, Schroeder, on behalf of the District, investigated the alleged incident. That investigation included an interview with Wagner. On August 19, 2020, Wagner was given written notice that he was being placed on administrative leave, without pay, and that the District was planning to recommend to the Board that he be terminated from his position. He was advised that the District determined that he was untruthful during his interview and that he had been intoxicated on the evening of June 22, 2020, and pushed Kim to the ground. He was given a draft of the bill of particulars and informed that he could attend the meeting before the Board—where the District would recommend his termination—and defend himself against the charges.

¶ 6     On September 14, 2020, a hearing was held before the Board but Wagner did not attend. The Board adopted a resolution to dismiss Wagner from his teaching position. Attached to the resolution was a notice of dismissal and a bill of particulars. The notice of dismissal alleged that Wagner's conduct in June 2020—namely, shoving his wife to the ground on two occasions with

at least one instance witnessed by their children—was immoral, unprofessional, and in violation of Board Policy 5:120, involving ethics and conduct. The dismissal notice also alleged that Wagner was insubordinate during the District's investigatory interview because his statements to Schroeder conflicted with what was told to police on the night of the incident and written in the police report. The notice instructed Wagner that he had the right to challenge the Board's resolution and request an administrative hearing before an independent hearing officer, pursuant to section 24-12(d)(1) of the School Code (105 ILCS 5/24-12(d)(1) (West 2020)).

¶ 7 The bill of particulars stated that Officer Ramirez, of the Lake Forest Police Department, was called to Wagner's home on June 22, 2020, in response to a domestic dispute. On arrival, Ramirez observed Wagner drinking an unknown alcoholic beverage and noticed the strong odor of alcohol on Wagner's breath. Wagner told Ramirez that he had consumed between 6 and 12 beers. Ramirez noticed blood on Wagner's right palm. Wagner said that he had been spinning his daughter around and accidentally dropped her on her head. Kim told Ramirez that Wagner was an alcoholic and had recently relapsed. Kim tried to leave the residence with her children to seek assistance for the laceration on her daughter's head, but Wagner blocked her path and shoved her to the floor twice. Wagner told Ramirez that he prevented Kim from leaving the home but denied that he had shoved Kim. He stated that Kim fell to floor when she ran into him. Ramirez arrested Wagner for domestic battery. On June 26, 2020, Kim obtained an emergency order of protection against Wagner, which was extended once. On October 20, 2020, a plenary order of protection was issued.

¶ 8 The bill of particulars further stated that the District investigated after seeing news reports of Wagner's arrest. In an interview with the District, Kim stated that Wagner had shoved her to the ground two times during the incident and had prevented her and their children from leaving

the home. The children had witnessed one of the times Wagner shoved Kim to the ground. During the District's interview with Wagner, Wagner denied shoving Kim or preventing her from leaving the home. He also denied drinking beer or telling the police that he had done so.

¶ 9　According to the bill of particulars, the District concluded, after its investigation, that Wagner had been dishonest during his interview. The District determined that Wagner's

> "immoral, criminal, unprofessional, and insubordinate conduct ha[d] no legitimate basis in school policy, [was] detrimental to the best interests of the District, [continued] to interfere with [his] ability to teach and with the learning environment, and [had] harmed its students, its staff, and the operations and function of the District."

The Board found that Wagner's conduct was irremediable and warranted his immediate termination from his employment.

¶ 10　Wagner requested a dismissal hearing pursuant to section 24-12(d)(1) of the School Code. *Id.* A dismissal hearing was held before a hearing officer on September 2 and October 20, 2021. Schroeder testified that, as the District's deputy superintendent, she was responsible for investigating disciplinary issues. She became aware of Wagner's arrest around mid-July 2020, when she saw an article in a local community newspaper. The article indicated that it was a domestic battery situation involving alcohol and pushing someone in his household. She was concerned because she knew that, if she was reading the article, there were other community members also reading it, including students, parents, and staff. She realized that the article was also posted on the Lake Forest Police Department arrest blotter and in the Chicago Tribune. She then checked the Lake County court public access system and realized there was also an order of protection. The documents related to the order of protection were admitted into evidence. Further, Schroeder requested and received a copy of the police report related to the incident.

¶ 11    Schroeder testified that she decided to investigate the alleged conduct that led to Wagner's arrest. She had an August 3, 2020, virtual meeting with Wagner. She asked Wagner if he had pushed his wife or been physical during the June 2020 incident. He denied it. She asked if he was drinking alcohol that night. He denied it. She asked him why he told the police he had been drinking. He denied telling the police that he had any alcoholic beverages that night, but he also stated that it was the last day he had anything to drink. Schroeder opined that Wagner did not verbalize or display any nonverbal indications that he had any concern regarding the event. In her experience, most employees she interviewed would show some signs of concern, such as by crying or their voices quivering. Wagner showed none of that and seemed to have no concern over what was in the media reports.

¶ 12    Schroeder testified that she had a virtual meeting with Kim a couple days later. Kim told Schroeder that, in the morning on June 22, 2020, she and Wagner argued over some credit cards. Later in the evening, Wagner was in the garage, where he often went to drink excessively. Their daughter went out to the garage to say good night. Their daughter came back into the house a short time later screaming and bleeding. Kim and Wagner ended up in a different room, where he shoved her to the ground. The children saw it happen. Kim went downstairs to get her phone and Wagner pushed her down again. She collected the children and said she was leaving. Wagner stood in the doorway and would not let her pass. She called 911 but hung up. When 911 called back, "she lost it." She told the dispatcher that there were guns in the house. When officers arrived, they took a statement from her, collected the guns, and arrested Wagner. Kim's daughter said that Wagner was spinning her around but lost his balance and she fell and hit her head. Kim did not think that Wagner would intentionally hurt their daughter. Kim told Schroeder that she had spoken to multiple colleagues about the incident. Kim's voluntary written statement that she gave to the

police and signed on the night of the incident was admitted into evidence. It was essentially identical to what Kim told Schroeder during the interview.

¶ 13    Schroeder further testified that she called the Lake Forest Police Department to make sure she had received all possible information concerning the June 2020 incident and that the police report was accurate. Schroeder also spoke with two other District employees—Art Kessler, and Lisa Hirsh. At the time, they both had children at Edgebrook. At a Board meeting, Hirsh told her that someone had contacted Hirsh about the media reports involving Wagner. At a follow up meeting, Hirsh stated that a friend, who was also an Edgewood parent, expressed concern about Wagner's arrest and that he would be serving as a teacher at Edgewood. Hirsh stated that she was also concerned and would not want her own child in Wagner's classroom. Hirsh's statements were allowed only for the purpose of notoriety—to show that there was public awareness of the issue.

¶ 14    Schroeder also spoke with Kessler. Kessler expressed concern because his son, an Edgewood student, and the son's friends found the media articles online and were discussing the domestic battery involving Wagner. Specifically, they were talking about Wagner hitting Kim and Kim being one of their former teachers. Schroeder further testified that she spoke with Edgewood's principal, Anthony Candela, who stated that he was receiving e-mails from parents regarding the media reports about Wagner. Schroeder testified that she considered the information from Candela, Hirsh, and Kessler when making her recommendation to terminate Wagner. She believed that the media reports had impacted the community's thoughts on Wagner's employment in the District. Schroeder testified that she was extremely concerned about the notoriety of Wagner's arrest and the harm he had caused as a role model for students in the District.

¶ 15    Schroeder testified that she appeared before the Board on September 14, 2020, to present her findings and recommendation. Wagner chose not to appear at the Board meeting. In addition

to sharing the information to which she already testified, she also shared copies of Wagner's personnel file, which included previous discipline. Schroeder believed that the previous discipline showed that Wagner had a pattern of unprofessional, insubordinate, and dishonest behavior. The District's Exhibit 11 was a June 2006 letter from the District to Wagner. It set forth various complaints, such as that Wagner asked female students to sit on his lap, discussed the sexual orientation of another teacher with a group of students, inappropriately commented on female students' appearance or clothing, made embarrassing comments about a student or his or her family in front of the whole class, and exhibited excessive anger during class. After an investigation, the District concluded that there was "evidence of poor professional judgment, inappropriate humor and questionable teaching techniques, causing [the District] grave concern." The District set forth eight behavioral directives for Wagner to follow, recommended that he request a transfer to a different school, and urged him to seek the services of the District's employee assistance program. The District's Exhibit 13 was a November 2012 letter to Wagner, which outlined new allegations of inappropriate behavior with students. The 2012 letter reiterated to Wagner that he was required to comply with the directives in the June 2006 letter.

¶ 16    Schroeder testified that she did not recommend that Wagner be terminated because he was arrested. She believed that his conduct was irremediable because, based on the arrest and his previous behaviors, the damage to his reputation was significant and widely known. She did not believe that he could return to the classroom. She was aware that there was never a criminal conviction and the domestic battery charges were dismissed. She nonetheless concluded that Wagner had engaged in the alleged conduct, based on the police report and the interviews she conducted. She determined that the police report and Kim's statements during her interview were more credible than Wagner's statements.

¶ 17    Candela testified that he was the principal at Edgewood. He was aware, through conversations with staff and parents, that there was negative information circulating about Wagner. Candela had concerns that Wagner's return to the classroom could cause disruption to the learning environment. Candela knew that students were talking about what happened, and he was concerned that it could cause students to feel unsafe. He also knew that fellow staff members had concerns and would feel very uncomfortable working with Wagner. Candela testified that he would not be comfortable with Wagner's return to the classroom.

¶ 18    Kim's testimony was very similar to what she said during her interview with Schroeder. However, she added that she had been drinking the evening of the incident and that, when Wagner came upstairs following their bleeding daughter, Kim grabbed the largest hairbrush she could find and started hitting Wagner on the head. She told Ramirez that she had hit Wagner with a brush. Kim acknowledged that the police report did not include a statement that Kim had hit Wagner. Kim said that was because Ramirez did not seem to think it was important. Kim acknowledged that Wagner pushed her twice that evening—one time she fell on the bed and another time she fell on the ground—but Wagner did not "deck" or "slap" her. Kim further testified that she did not think Wagner had a lot to drink that day, because he had been sleeping most of the day. He did not have a drink until about 8 p.m. She did not think Wagner was drinking earlier in the day when she was not home, because he was not normally a day drinker. She opined that Wagner did not let her leave the house because she had been drinking and he was trying to prevent her from driving away with their daughter.

¶ 19    Kim testified that there is an automatic three-day order of protection when someone is arrested for domestic battery. The Department of Children and Family Services told her that she needed to file for an extension or her kids would be taken away from her. She hired a lawyer to do

that. When she told her lawyer about hitting Wagner with a hairbrush, he advised her to stop talking about it because, if she told anyone, she risked being arrested. Kim acknowledged that her testimony at the hearing was the first time she told anyone at the District that she had instigated the domestic dispute in June 2020. She said that was because she was given legal advice to not tell anyone. She acknowledged that she never called Schroeder to tell her that she had instigated the dispute. Kim testified that she may have made a mistake by not calling Schroeder but that she was "all about self-preservation" for a long time.

¶ 20     Ramirez testified that he was a patrol officer for the Lake Forest Police Department. On June 22, 2020, just before 10 p.m., he was dispatched to Wagner's home for a domestic battery where the caller stated that her husband was intoxicated and had dropped their daughter, who was bleeding. Upon arrival, Ramirez saw Wagner in the garage, drinking what appeared to be an alcoholic beverage. Two other officers also arrived. Ramirez asked Wagner why he had blood on his palm. Wagner said that he was spinning his daughter around and dropped her on her head. Ramirez noticed a strong odor of alcohol on Wagner's breath. Ramirez asked Wagner how much he had to drink, and Wagner stated that he had between 6 and 12 beers. Ramirez believed that Wagner was intoxicated based on the odor of alcohol on his breath and his slurred speech and bloodshot glassy eyes.

¶ 21     Ramirez further testified that, while the other officers remained with Wagner in the garage, he went inside the home. Kim and the children were upstairs in the hallway. He noticed blood on the walls and on Kim and her daughter. The daughter told him that she was injured when Wagner dropped her. Kim told him that Wagner was an alcoholic and had recently relapsed. When she saw her daughter covered in blood, she panicked. She also said that Wagner had blocked her from leaving the home and that he had shoved her to the ground on the second floor and also on the first

floor. Kim never stated that she had been physical with Wagner. The only physical contact she indicated was Wagner blocking her exit when she was trying to get past him. Kim never stated that she hit Wagner. If Kim had indicated that she was physical with Wagner during the dispute, Ramirez would have included that in the police report, as it would have changed the situation to mutual combatants and no arrest would have been made. Kim did not have any indicators of intoxication—she did not stumble, slur her speech, or have the odor of alcohol on her breath.

¶ 22   After speaking with Kim, Ramirez went back to the garage. He asked Wagner whether he shoved Kim to the ground. Wagner denied that he had shoved Kim but acknowledged that he had blocked her from leaving the residence. Ramirez then placed Wagner under arrest for domestic battery. The police report was admitted into evidence and was similar to Ramirez's testimony at the hearing.

¶ 23   On February 22, 2022, the hearing officer issued his findings and recommendation. He found that Kim's statements to Ramirez and Schroeder and her voluntary written statement were more consistent and credible than her testimony at the hearing. He concluded that Wagner had pushed Kim down twice on the night of the incident. He also concluded that Wagner was dishonest during his interview with Schroeder when Wagner denied being intoxicated, blocking Kim from leaving their home, or pushing her to the ground. The hearing officer also concluded that there was a nexus between Wagner's off duty conduct in June 2020 and his position as a teacher with the District. The nexus was that there was significant notoriety surrounding the incident; teachers are held to a higher standard of conduct, and the public knew not only Wagner but also Kim, as they were both employees of the District.

¶ 24   Nonetheless, the hearing officer concluded that Wagner's conduct was not irremediable. The hearing officer stated that Wagner's previous discipline was unrelated to the June 2020

altercation and did not create a pattern of misconduct. The hearing officer found that the only basis for a finding that the conduct was irremediable was the public perception of what occurred. He concluded that, putting aside public opinion and considering only the location and facts surrounding the altercation, the conduct was remediable. He determined that Wagner's dishonesty with Schroeder warranted severe discipline but that it was not irremediable conduct. The hearing officer determined that Wagner should be reinstated, but he awarded back pay only from the start of the 2021-22 school year. Further, he concluded that any repetition of the events of June 2020 would be grounds for immediate dismissal.

¶ 25    On March 15, 2022, the Board issued a formal resolution dismissing Wagner. The Board adopted the hearing officer's findings of fact. However, in accord with authority granted by the School Code (*id.* § 24-12(d)(8)), it also modified and supplemented the findings of fact and the ultimate conclusion rendered by the hearing officer that it determined were against the manifest weight of the evidence.

¶ 26    Specifically, the Board supplemented some of the hearing officer's summary of the evidence. The Board stated that the publication in several news sources of the June 2020 incident eroded the community's trust in Wagner's ability to control himself around students in the classroom. The Board also clarified that Kim had ample opportunity to update her version of the events with the District but never did so. Kim gave no indication that she was an instigator of the incident in an e-mail sent to Schroeder requesting that Schroeder reconsider recommending Wagner's dismissal, and Kim did not attend the September 2020 Board hearing recommending Wagner's dismissal. In addition, Wagner did not attend the September 2020 Board meeting or otherwise attempt to update the circumstances surrounding the incident.

¶ 27    The Board concluded that some of the hearing officer's conclusions were against the manifest weight of the evidence. Specifically, the Board held that Wagner's prior discipline was related to the conduct underlying his dismissal and established a pattern of unprofessional conduct. In 2006, an investigation into complaints about his behavior in the classroom resulted in the Board issuing directives for Wagner to maintain respectful relationships with staff members, refrain from making comments to students regarding their clothes or physical appearance, and refrain from discussing personal issues and yelling excessively in the classroom. In 2012, Wagner was issued a reprimand for commenting on a student's attire and touching her shoulder. In 2020, Wagner was issued another written reprimand for making inappropriate and unprofessional comments to students.

¶ 28    The Board found that the hearing officer's conclusion that Wagner's dishonesty was remediable was against the manifest weight of the evidence. The Board stated that the hearing officer underestimated the impact of Wagner's dishonesty on the District. The Board noted that honesty was a basic expectation of Wagner's employment and was not something that employees must be warned to maintain. Wagner willfully misled the Board, and his conduct showed an indifference to the moral standards expected of teachers. Further, Wagner's failure to inform the Board of Kim's alleged participation in the June 2020 physical altercation was a lie by omission or, alternatively, he allowed Kim to perjure herself at the dismissal hearing. Either way, Wagner could no longer be trusted to act with integrity or honesty.

¶ 29    The Board also determined that the hearing officer's finding that, "absent public opinion, Mr. Wagner's conduct would be remediable" was against the manifest weight of the evidence. The Board noted that the evidence supported the public perception that Wagner could no longer serve as a role model to students. Further, his inability to control his anger and physical violence toward

his wife in front of his children was immoral, unethical, and criminal, and his dishonesty during the investigation was unethical, unprofessional, and insubordinate. The Board concluded that Wagner's conduct violated Board policy 5:120 and was irremediable grounds for his dismissal, regardless of notoriety.

¶ 30    Finally, the Board concluded that a warning could not undo the damage that Wagner caused to his reputation with students, parents, staff, and the administration. The Board noted Wagner's lack of emotion or concern regarding his conduct, the circulation of the information in the general community, or its effect on the District. The Board specifically noted that Wagner never expressed a desire to repair his reputation in the District community. The Board determined that there was no basis to find that the damage to Wagner's reputation could be remedied with a warning, concluded that his conduct was irremediable, and terminated his employment.

¶ 31    Thereafter, Wagner filed a complaint for administrative review of the Board's decision in the circuit court of Lake County, pursuant to section 24-16 of the School Code (*id.* § 24-16) and the Administrative Review Law (Review Law) (735 ILCS 5/3-101 *et seq.* (West 2020)). On December 13, 2022, following a hearing, the trial court affirmed the Board's decision to terminate Wagner's employment. Wagner filed a timely notice of appeal.

¶ 32                                  II. ANALYSIS

¶ 33    On appeal, Wagner argues that the Board failed to prove irremediable cause for dismissal. He argues that the Board's factual findings that his June 2020 conduct was criminal, immoral, and unprofessional, and that he was dishonest during his interview with Schroeder, were against the manifest weight of the evidence. He also argues that the Board failed to prove harm to students, faculty, or staff and failed to prove that his conduct could not be remedied by a warning. Additionally, Wagner argues that the Board is precluded from establishing irremediable cause for

dismissal, because of its own unlawful conduct in firing him based on his arrest record, in violation of section 2-103(A) the Illinois Human Rights Act (775 ILCS 5/2-103(A) (West 2020)). Finally, Wagner argues that the hearing officer erred in recommending a less than make-whole remedy upon his reinstatement.

¶ 34    Section 24-16 of the School Code specifically adopts the Review Law for judicial review of the Board's final administrative decisions issued under section 24-12 of the School Code. 105 ILCS 5/24-16 (West 2020). In administrative cases, we review the decision of the administrative agency and not the ruling of the trial court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). In the present case, the administrative agency is the Board. Generally, we review the Board's decision, not that of the hearing officer, which is merely a recommendation to the Board. *Raitzik v. Board of Education of Chicago*, 356 Ill. App. 3d 813, 823 (2005); see *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶¶ 57, 61 ("the decision of the school board is the final decision for purposes of administrative review," even where witness credibility drove the findings and the hearing officer, rather than the board, observed the witnesses). The Board is the judge of the credibility of the witnesses. *Polk v. Board of Trustees of the Police Pension Fund*, 253 Ill. App. 3d 525, 536 (1993).

¶ 35    Our review of the Board's decision to dismiss an employee requires a two-step approach. *Beggs*, 2016 IL 120236, ¶ 63. First, we must determine whether the Board's factual determinations were against the manifest weight of the evidence. *Id.* A factual determination is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.* ¶ 50. Second, we must determine whether the factual findings provided a sufficient basis for the Board's conclusion that cause existed for discharge or dismissal. *Id.* ¶ 63. "A school board's determination of cause to discharge is not *prima facie* true and correct; it is instead subject to reversal where it is

arbitrary, unreasonable, or unrelated to the requirements of service." *Id.* The "clearly erroneous" standard of review applies to this mixed question of law and fact. *Id.* A decision is clearly erroneous "where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 36                         A. Board's Factual Findings

¶ 37     Wagner argues that the Board's factual findings—that he engaged in criminal, immoral, and unprofessional conduct and that he was dishonest during his interview with Schroeder—were against the manifest weight of the evidence. He asserts that he was denied a fair hearing because the Board improperly credited unreliable hearsay testimony over Kim's live testimony at the dismissal hearing. We disagree.

¶ 38     The Board's factual determinations were not against the manifest weight of the evidence. The Board found Ramirez's testimony at the dismissal hearing more credible than Kim's testimony. Ramirez testified that, when he responded to the scene of the June 2020 incident, Kim told him that Wagner was intoxicated and had knocked her down twice. Wagner told Ramirez that he had consumed between 6 and 12 beers. Ramirez denied that Kim made any statements about hitting Wagner with a hairbrush and testified that, if she had done so, it would have changed the investigation. Ramirez's testimony regarding the statements made on the night of the incident were consistent with his police report, Kim's voluntary written statement, and Kim's statements to Schroeder during the investigatory interview. As there was evidence supporting the conclusion that on June 22, 2020, Wagner engaged in the conduct alleged, a conclusion opposite to that of the Board is not clearly apparent.

¶ 39    Wagner argues that the Board's determination is erroneous because it was based entirely on hearsay. He asserts that the police report, news articles about Wagner's arrest, documents related to the order of protection, and testimony of Ramirez and Schroeder were all hearsay and, therefore, any reliance on the foregoing was improper. This argument is without merit. We acknowledge that generally, as a matter of procedural due process, hearsay evidence is not admissible in an administrative proceeding. *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 79. However, "the strict rules of evidence that apply in a judicial proceeding are not applicable to proceedings before an administrative agency." *Id.* In fact, " 'where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error.' " *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 94 (1992) (quoting *Goranson v. Department of Registration & Education*, 92 Ill. App. 3d 496, 501 (1980)).

¶ 40    In the present case, the admission of the documents related to the order of protection was not improper, as they were certified copies of public records. See Ill. R. Evid. 902(4) (eff. Sep. 28, 2018). Wagner's argument that Ramirez's testimony was improper is without merit because Ramirez was testifying about his official investigation of the incident at Wagner's home. *People v. Evans*, 2018 IL App (4th) 160686, ¶ 38 ("hearsay testimony may be introduced when a police officer offers testimony regarding his or her official investigation of an offense"). Wagner argues that Schroeder's testimony was hearsay because it was based entirely on what she read in the news reports of Wagner's arrest and the police report. However, the record shows that Schroeder's conclusions were based on the results of her investigation and her interviews with Kim and others, and not entirely on the police report or the news reports.

¶ 41     The only potential improper hearsay was the police report and the news articles of Wagner's arrest. The record indicates that the hearing officer initially admitted the police report and news articles for the purpose of establishing the reason the District began its investigation of Wagner, not for the truth of the matter asserted. However, even if the police report and the news articles were admitted for the truth of the statements, there was no prejudicial error because the statements were corroborated by Ramirez's testimony and Kim's statements during her interview with Schroeder, her written statement on the night of the incident, and her written statement in her verified petition for order of protection. See *Abrahamson*, 153 Ill. 2d at 94.

¶ 42     Wagner argues that Kim's testimony at the dismissal hearing was the most credible because she was the only one who testified with firsthand knowledge of the events at issue. However, Kim did not deny that Wagner pushed her down twice and prevented her from leaving the home. At the dismissal hearing, she added only that she had been drinking and had instigated Wagner's response by repeatedly hitting him with a hairbrush. The Board is responsible for making factual findings. The Board determined that Kim's version of events set forth in her written statement on the night of the incident, in the verified order of protection, and in her interview with Schroeder, were more credible than her live testimony at the hearing. We cannot say that this determination was against the manifest weight of the evidence. It is not the duty of this reviewing court to reweigh evidence or determine the witnesses' credibility. *East St. Louis School District No. 189 v. Hayes*, 237 Ill. App. 3d 638, 646 (1992). Based on the evidence presented at the hearing, a rational trier of fact could agree with the Board's determination. We therefore find that it is not contrary to the manifest weight of the evidence.

¶ 43     Finally, we note that Wagner argues only that he did not commit the alleged conduct. He does not attempt to argue that, even if he did commit the alleged conduct, it was not sufficient

cause for dismissal. In his reply brief, he raises the argument that the alleged conduct was not "criminal" because the domestic battery charges did not result in a criminal conviction. However, the word "criminal" in the bill of particulars is used to modify the term "conduct." Black's Law Dictionary defines "criminal" in its adjective form as, "1. Of, relating to, or involving a crime; in the nature of a crime <criminal mischief> *** 3. Wrong, dishonest, and unacceptable." Black's Law Dictionary (11th ed. 2019). As such, the word "criminal" encompasses more than a criminal conviction. Moreover, while Wagner was not ultimately convicted of domestic battery, there was still cause for dismissal. Cause for dismissal has been defined as " 'that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness.' " *Pacernick v. Board of Education of the Waukegan Community Unit School District No. 60*, 2020 IL App (2d) 190959, ¶ 108 (quoting *Raitzik*, 356 Ill. App. 3d at 831). A school board has the power "[t]o dismiss a teacher for incompetency, cruelty, negligence, immorality or other sufficient cause *** whenever, in its opinion, the interests of the schools require it." 105 ILCS 5/10-22.4 (West 2020). We hold that the Board's determination that Wagner's conduct established sufficient cause for dismissal was not erroneous.

¶ 44                                      B. Irremediability Finding

¶ 45    Next, Wagner argues that the Board erred in determining that his conduct was irremediable. Under section 10-22.4 of the School Code, a tenured teacher may be removed from employment only for remediable cause or irremediable cause. *Id.* "Remediable" cause is defined as conduct by a teacher that could ordinarily be remedied if it was called to his or her attention. *Ahmad v. Board of Education of Chicago*, 365 Ill. App. 3d 155, 163 (2006). Before a school district can terminate a tenured teacher who engages in "remediable" conduct, the district must provide a written "Notice

to Remedy" of those "causes that, if not removed, may result in charges." 105 ILCS 5/24-12 (West 2020).

¶ 46    "Irremediable conduct" is defined as conduct that causes damage to the students, the faculty, or the school itself that could not have been corrected if warnings had been given by the teacher's supervisors. *Ahmad*, 365 Ill. App. 3d at 163. In *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143 (1977), our supreme court set forth a two-part analysis pertinent to determining whether conduct is irremediable: (1) whether the teacher's conduct caused significant damage to students, faculty, or the school and (2) whether the teacher would not have corrected his or her conduct, even if he or she had been issued a written warning and a period of time for remediation. *Id.* at 153. In cases involving conduct that is immoral or criminal, "the second prong is altered to assess *whether the effects of the conduct could have been corrected*." (Emphasis in original.) *Pacernick*, 2020 IL App (2d) 190959, ¶ 133. Whether conduct is irremediable is a question of fact, which we review under the manifest weight of the evidence standard. *Younge v. Board of Education of Chicago*, 338 Ill. App. 3d 522, 531 (2003). If a teacher's conduct is deemed irremediable, no written warning is required before initiating a dismissal action. *Pacernick*, 2020 IL App (2d) 190959, ¶ 122. In this case, no written warning was given prior to Wagner's termination and the Board concluded that his conduct was irremediable.

¶ 47                                  1. First Prong

¶ 48    Wagner first argues that the District failed to prove any harm to students, faculty, or the school. Wagner's assertion is based on the premise that the testimony presented at the dismissal hearing was hearsay and thus could not be a proper basis for establishing any harm. Wagner argues that his conduct could not have caused any harm because the District failed to establish that he actually engaged in the conduct alleged in the police report or that anyone in the community had

firsthand knowledge of his actual conduct on the night of the incident. As explained above, this assertion is without merit. Based on the evidence presented, the Board's determination that Wagner actually engaged in the alleged conduct was not against the manifest weight of the evidence.

¶ 49     Moreover, we find no error in the Board's determination that the alleged conduct harmed students, faculty, and the school. Wagner's dishonesty with Schroeder during the investigatory interview clearly damaged his relationship with the District's administrators and his fellow faculty members, and their ability to trust that he would behave professionally and honestly. Wagner's conduct, which was well publicized, properly caused community concern about his ability to return to the classroom. "[T]eachers occupy a special position of trust in our society. As leaders and role models, it is the teacher's responsibility to instill basic societal values and qualities of good citizenship in the students." *Board of Education of Argo-Summit School District No. 104 v. State Board of Education*, 138 Ill. App. 3d 947, 952 (1985). Schroeder testified that she was concerned that Wagner's reputation had been damaged to the point that he could no longer serve as a role model for students. Candela testified that he was concerned that the circulation of negative information would make students feel unsafe and impact the learning environment. Wagner's conduct was clearly harmful to the reputation of the faculty and the school and harmful to his ability to model positive values for students. These are appropriate considerations when determining whether the first prong of *Gilliland* is satisfied. See *Fadler v. State Board of Education*, 153 Ill. App. 3d 1024, 1028 (1987).

¶ 50                                            2. Second Prong

¶ 51     Wagner next argues that the District failed to prove that his alleged conduct could not be remedied with a prior warning. Wagner argues that there was no evidence that such conduct would

recur, that his dishonesty would not be remedied with a warning, or that his completely unrelated prior discipline established a pattern of misconduct.

¶ 52    We cannot say that the Board's irremediability finding was against the manifest weight of the evidence. Schroeder testified that, during her investigatory interview with Wagner, he was dishonest and failed to express any emotion or remorse. We agree with the Board that honesty is a basic expectation in an employment relationship. In light of Wagner's dishonesty and failure to take responsibility for his actions, there was no error in determining that Wagner's conduct would not have changed had he been given a warning. Even applying the alternative formulation for the second prong set forth in *Gilliland*, our decision would be the same. A warning could not have corrected the effects that the conduct had on the school, faculty, and students. Wagner's conduct damaged his own reputation and the reputation of the school district and a warning could not undo or correct that damage. Courts have repeatedly "affirmed the dismissal of a tenured teacher who has engaged in unethical conduct, although the offending conduct did not involve students and did not occur on the school premises." *Ahmad*, 365 Ill. App. 3d at 166 (citing, in part, *McCullough v. Illinois State Board of Education*, 204 Ill. App. 3d 1082, 1090 (1990) (affirming the dismissal of a teacher with a criminal tax conviction because the teacher could no longer function as a role model)); *Chicago Board of Education v. Payne*, 102 Ill. App. 3d 741, 748 (1981) (affirming the dismissal of teacher who pled guilty to possessing marijuana, because involvement in illegal activities would have a major deleterious effect upon the school system).

¶ 53    Wagner argues that the Board erred in considering his prior discipline, because it was not mentioned in the bill of particulars. However, as noted, the Board is allowed to receive all oral and written evidence without strict adherence to the legal rules of evidence. *Kimble*, 2014 IL App (1st) 123436, ¶ 79 (the strict rules of evidence are not applicable to proceedings before an administrative

agency). Schroeder testified that she presented Wagner's prior discipline to the Board at the September 2020 hearing. Wagner chose not to attend that hearing and thus did not object to that evidence. Wagner argues that the hearing officer found evidence of the prior discipline to be improper, but this is a misrepresentation of the record. The hearing officer allowed Schroeder to testify about Wagner's prior discipline and admitted the related evidence. The hearing officer concluded only that the prior discipline did not establish a pattern of misconduct because the conduct related to the prior disciplinary actions was not similar to the June 2020 conduct. On appeal, the Board argues only that Wagner's prior discipline supports its decision that Wagner's June 2020 conduct was irremediable. We agree that the prior discipline supports the Board's determination. The prior discipline demonstrated a pattern of unprofessional behavior that diminished Wagner's ability to be a role model for students. Wagner's off-duty conduct at issue in this case added to the pattern of unprofessional conduct. However, even absent any prior discipline or an established pattern of misconduct, we would affirm the Board's decision.

¶ 54    Finally, Wagner argues that the District is precluded from establishing irremediable cause for dismissal under section 24-12(d) of the School Code by virtue of its own unlawful conduct in violating Wagner's civil rights. Specifically, Wagner argues that, under section 2-103(A) of the Human Rights Act (775 ILCS 5/2-103(A) (West 2020)), the District is precluded from terminating his employment on the basis of an arrest record. We decline to address this argument. First, it is forfeited because Wagner has failed to cite any authority that a violation of section 2-103(A) of the Human Rights Act precludes as a matter of law a finding of irremediable cause to dismiss. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 (contentions without citation to authority do not merit consideration on appeal). Moreover, Wagner's argument turns on whether the Board violated section 2-103(A) of the Human Rights Act, and we can take judicial notice that

this issue is currently being litigated in a separate case. See *Wagner v. Board of Education of North Shore School District 112*, 2023 IL App (2d) 220277. Wagner did not move to consolidate that case with the present case.

¶ 55    As we affirm the Board's decision to terminate Wagner's employment, we need not address Wagner's argument that the hearing officer erred in recommending a less than make-whole remedy.

¶ 56                              III. CONCLUSION

¶ 57    For the reasons stated, the judgment of the circuit court of Lake County, which upheld the Board's decision, is affirmed.

¶ 58    Affirmed.

*Wagner v. Board of Education of North Shore School District 112*,
**2023 IL App (2d) 220453**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 22-MR-177; the Hon. Jorge L. Ortiz, Judge, presiding. |
| **Attorneys for Appellant:** | Joshua M. File, of Katz, Friedman, Eisenstein, Johnson, Bareck & Bertuca, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Emily Tulloch, of Franczek P.C., of Chicago, for appellee Board of Education of North Shore School District 112. <br><br> No brief filed for other appellee. |